## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**                                              **NO. 23-52**

**TERRANCE PICKETT**                              **SECTION "O"**

## ORDER AND REASONS

Before the Court is a motion[1] to suppress evidence filed by defendant Terrance Pickett ("Pickett" or "Defendant"). Defendant seeks to suppress a firearm seized pursuant to a *Terry* stop. The Court held a hearing on the motion.[2] For the following reasons, the motion is **GRANTED.**

## I.    BACKGROUND

On Saturday, November 26, 2022, the Bayou Classic Football Game took place in New Orleans.[3] The weekend of the Bayou Classic draws large crowds and has historically seen an uptick in violent crime, including shootings, on Bourbon Street.[4] To ensure the safety of visitors to the French Quarter, the New Orleans Police Department ("NOPD") deployed additional officers to the area to conduct patrols throughout the evening.[5] NOPD's general goal was to "look for any agitators" and "people violating the law."[6] The "primary focus," however, was to "locat[e] firearms

---

[1] ECF No. 27.
[2] ECF No. 42 (July 30, 2024 Suppression Hearing Transcript).
[3] *Id.* at 5:19-6:1.
[4] *Id.* at 5:19-6:15.
[5] *Id.* at 5:19-6:25; 12:10-25.
[6] *Id.* at 33:25-34:1-4.

on Bourbon street."[7] Six officers were assigned to the 400-block of Bourbon Street: Officers Tillery, Jones, Singleton, Norman, Antoine, and Collins.[8]

At approximately 10:45 p.m., Officer Antoine alerted Officer Tillery that she observed a man (defendant Pickett) walking down Bourbon Street with the outline of a firearm visible inside his front right pants pocket.[9] As Officer Antoine later admitted at the suppression hearing, there was nothing about Pickett's behavior that caused the officers concern or suspicion "other than the weapon" in his pocket.[10] According to Officer Antoine, Pickett was "walking calmly" and did not "appear nervous in any way" to her.[11] She agreed that he did not appear to be "drinking" or "smoking dope" or "out of control"—rather, he was "glued to his phone texting" with hands that were not "near his pocket."[12]

The interaction between the NOPD officers and Pickett was recorded via body camera footage from three officers.[13] As the footage shows, a bulge was visible in Pickett's right pants pocket as he casually walked down a crowded block of Bourbon Street, texting on his phone.[14] As Pickett moved to pass the officers, Officer Antoine suddenly reached out and grabbed Pickett's arms from behind, turning his body towards the other officers.[15] As two officers moved to restrain Pickett, Officer Antoine

---

[7] *Id.* at 34:3-4.
[8] ECF No. 27-2 at 3 (NOPD Incident Report).
[9] *Id.*; ECF No. 42 at 8:9-19 (Testimony of Officer Antoine).
[10] *Id.* at 17:4-8.
[11] ECF No. 42 at 14:24-16:3 (agreeing with defense counsel's cross-examination).
[12] *Id.*
[13] *Id.* at 27-3 (Exhibits A and B); ECF No. 42 at 37:12-15 (admitting Exhibit C).
[14] ECF No. 27-3 (Ex. A at 00:41-46).
[15] *Id.* (Ex. B at 00:50-52); ECF No. 42 at 8:22-25.

said, "in his pocket."[16] Officer Tillery and Officer Jones removed the gun from Pickett's right pocket.[17] As the footage shows—and as Officer Antoine later testified—Pickett did not resist or back away when he was grabbed and restrained by the officers; rather, he appeared "shocked."[18]

After removing the gun from Pickett's pocket, the officers placed handcuffs on him.[19] As officers were securing the handcuffs, Officer Norman read Pickett his *Miranda* rights and placed him under arrest.[20] Throughout this interaction, the officers never asked Pickett if he had a permit for his concealed weapon or any other investigatory questions.[21] They also did not tell him why he had been arrested.[22]

Without providing any explanation to Pickett, three officers proceeded to walk him in handcuffs down Bourbon Street.[23] They were heading to the Eighth District station, which is approximately two-and-a-half minutes away on Royal Street.[24] After walking with the officers for almost a full minute, Pickett can be heard asking Officer Antoine, "what did I do, though?"[25] She responded, "you carried a concealed firearm."[26]

---

[16] ECF No. 27-3 (Ex. B at 00:52-54); ECF No. 42 at 19:10-11.

[17] ECF No. 27-3 (Ex. B at 00:54-57); ECF No. 42 at 38:21-22

[18] ECF No. 27-3 (Ex. B at 00:54-1:30); ECF No. 42 at 16:20-22.

[19] ECF No. 27-3 (Ex. A at 00:55-01:15).

[20] *Id.* (Ex. A at 01:10-01:51); ECF No. 27-2 at 3.

[21] ECF No. 42 at 27:16-28:5.

[22] ECF No. 27-3 (Ex. A 00:50-02:00).

[23] *Id.* (Ex. A at 01:55-02:50).

[24] *Id.* (Ex. A at 01:55-04:32); ECF No. 42 at 35:2-8.

[25] *Id.* (Ex. A at 02:48-02:50).

[26] *Id.* (Ex. A at 02:50-53). Though the audio is unclear, Pickett may have replied, "I thought that was legal?" *Id.* (Ex. A at 02:53-54).

Once at the police station, the officers determined that Pickett did not have a carry and conceal permit for the firearm in his pocket, as was required by Louisiana law at that time.[27] After discovering that Pickett also had a prior felony conviction, Pickett was booked on state charges of illegal carrying of a concealed firearm by a felon. *See* La. R.S. §§ 14:95, 95.1.

Pickett was later indicted in federal court for possession of a firearm as a felon, 18 U.S.C. § 922(g)(1).[28] Pickett filed a motion[29] to dismiss the indictment, arguing that 18 U.S.C. § 922(g)(1) is unconstitutional. The government opposed the motion.[30]

Pickett also filed a motion[31] to suppress the evidence discovered through the stop and search. Pickett argues that the officers' search and seizure of his person violated his Fourth Amendment rights and that the evidence obtained by the officers should be suppressed for several reasons. First, Pickett contends that the officers did not have sufficient grounds to conduct the initial stop of him on Bourbon Street because reasonable suspicion that a person is carrying a concealed firearm does not equate to reasonable suspicion of criminal activity as required for a stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968). Second, Pickett argues that even if the stop was initially constitutional, the officers subsequently exceeded their justifiable scope when they grabbed Pickett's arms and searched his pocket while handcuffing him without questioning him first or conducting a patdown. Third, Pickett asserts that

---

[27] Louisiana has since adopted a permitless concealed carry scheme. *See* La. Rev. Stat. § 14:95(M).
[28] ECF No. 1.
[29] ECF No. 26.
[30] ECF No. 33.
[31] ECF No. 27.

even if the officers had conducted a proper frisk before discovering his firearm, they lacked reasonable suspicion to do so because there was no evidence that he was armed and dangerous; accordingly, the officers lacked probable cause to subsequently search his pocket and remove his firearm. Fourth, Pickett argues that the officers did not have probable cause that he had committed a crime before he was arrested. And finally, Pickett contends that upholding a search and seizure on these facts would create a conflict with his rights under the Second Amendment.

The Government opposed[32] the motion. The Government argues that the outline of a concealed firearm in the pocket of a person walking in a crowded and high crime area provides reasonable suspicion for a *Terry* stop and subsequent frisk. The Government further contends that the officers' brief frisk of Pickett immediately confirmed the presence of a gun, which provided additional basis to justify the subsequent detention of Pickett while the officers determined if he had a valid permit for the concealed weapon under Louisiana law.

The Court held an evidentiary hearing on the motion to suppress.[33] At that hearing, the Court heard evidence from Officers Antoine and Tillery as to the sequence of events surrounding Pickett's detention and arrest, and the NOPD's contemporaneous policy regarding *Terry* stops for concealed weapons.[34]

At the close of the hearing, the Court asked the parties whether they had any objection to waiting to resolve the motion to suppress, given the defendant was out

---

[32] ECF No. 32.
[33] ECF No. 38 (Minute Entry); ECF No. 42 (Transcript).
[34] *See generally* ECF No. 42.

on bond, until after the Fifth Circuit ruled on the appeal filed in *United States v. Wilson*, 2023 WL 3601590 (E.D. La. May 23, 2023), which presented a similar set of facts. Both parties indicated they had no objection.[35] Following the Fifth Circuit's publication of *United States v. Wilson*, 143 F.4th 647, 651 (5th Cir. 2025), the Court ordered[36] the parties to each file a memorandum addressing the impact of that case on the motion to suppress, and the parties obliged.[37]

## II.    ANALYSIS

### A. The *Terry* Stop Exception to the Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. It provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.*

The Supreme Court has recognized certain exceptions to the Fourth Amendment's requirement that the government obtain a probable cause warrant before searches or seizures.[38] *See United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). One such exception is the brief investigative stop first articulated in *Terry v. Ohio*, 392 U.S. 1 (1968). Under *Terry* and its progeny, an officer may briefly detain— that is, "seize"—a person for investigative purposes if the officer has a "reasonable

---

[35] *Id.* at 56:18-57:25.

[36] ECF No. 58.

[37] ECF Nos. 62, 63.

[38] When the government has not obtained a warrant, "the burden shifts to the government to justify the warrantless search" or seizure. *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (citation omitted).

suspicion" that the person is committing, or is about to commit, a crime. *Alexander v. City of Round Rock*, 854 F.3d 298, 303 (5th Cir. 2017).

Reasonable suspicion requires the officer to justify the stop with "articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). In other words, there must be "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). "Relevant facts and considerations may include a description of a suspect, a suspect's location and proximity to known or reported criminal activity, the timeliness of information or the stop, a suspect's behavior, and the officer's experience." *United States v. Alvarez*, 40 F.4th 339, 346 (5th Cir. 2022). Other factors can include a "suspect's presence in a high crime area" or "the time of day." *Alexander*, 854 F.3d at 304 (citations omitted). However, "a court may not consider the relevant factors in isolation from each other." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005); *see also United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001) ("The reasonable suspicion analysis is a fact intensive test in which the court looks at all circumstances together to weigh not the individual layers, but the laminated total.").

Importantly, "[t]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *Terry*, 392 U.S. at 34 (White, J., concurring). But "when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Thus,

7

"an encounter [with police] is 'consensual' so long as the civilian would feel free to either terminate the encounter or disregard the questioning." *United States v. Wise*, 877 F.3d 209, 219 (5th Cir. 2017) (citation omitted).

A legal *Terry* stop, therefore, is a temporary detention because it is not an interaction that the individual is free to ignore, but it is also not a formal arrest or search. *See Sokolow*, 490 U.S. at 7. An arrest or search requires probable cause, which is "'a fair probability that contraband or evidence of a crime will be found.'" *Id.* (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). The reasonable suspicion standard for a *Terry* stop is "less demanding" than the probable cause standard, while still requiring the officer to "articulate something more than an inchoate and unparticularized suspicion or hunch." *Id.* (citing *Terry*, 392 U.S. at 27) (internal quotation marks omitted).

To determine whether a *Terry* stop is constitutional, courts must examine (1) "whether the officer's action was justified at its inception," and then (2) "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (*en banc*). Therefore, even if the officer has sufficient reasonable suspicion to stop the suspect initially, the suspect's ensuing "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Id.* at 507. "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently

8

pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). In other words, for the scope of a stop to be justified, officers must investigate "in a diligent and reasonable manner." *Id.* at 687.

### B. The Officers Did Not Have Reasonable Suspicion for the Initial Stop

In its briefing before the suppression hearing, the Government argued that Louisiana's statutory scheme for concealed carry of firearms—which, at the time, prohibited concealed carry unless the person had a valid permit[39]—meant police officers were "justified in stopping the Defendant based on nothing but a reasonable suspicion he was carrying a concealed weapon."[40] At the suppression hearing, the Government reiterated that the officers had reasonable suspicion to perform a *Terry* stop and temporarily detain Pickett because they "had seen the gun in his pocket" and "it was obvious to them that it was a gun."[41]

After the suppression hearing, the Fifth Circuit published its opinion in *Wilson*, discussing whether officers may conduct a *Terry* stop based solely on the suspicion that an individual is carrying a concealed firearm. *See United States v. Wilson*, 143 F.4th 647 (5th Cir. 2025). Though the panel ultimately upheld the *Terry*

---

[39] When Pickett was arrested in 2022, Louisiana law prohibited "[t]he intentional concealment of any firearm . . . on one's person." La. Rev. Stat. § 14:95(A)(1)(a). That prohibition, however, did "not apply to a person with a valid concealed handgun permit." *Id.* § 14:95(A)(1)(b). The statute required that permits for concealed handguns "shall issue . . . to any Louisiana resident" who met the statutory requirements. *Id.* § 40:1379.3(A)(1). Any valid permit-holder armed with a concealed handgun was required to "notify any police officer who approaches the individual in an official manner or with an identified official purpose that the individual has a weapon on his person, submit to a pat down, and allow the officer to temporarily disarm him." *Id.* § 40:1379.3(I)(2).

[40] ECF No. 32 at 10.

[41] ECF No. 42 at 47:6-12.

stop in that case on other grounds and affirmed the district court's denial of the motion to suppress, the court opined that "[t]he mere fact that a citizen carries a firearm does not create reasonable suspicion that he committed a crime." *Id.* at 653. Examining the same Louisiana statutory scheme as was relevant in this case, the Fifth Circuit expressly rejected a "categorical rule that presumes Louisiana gun owners are committing crimes" simply by carrying a concealed weapon, explaining that such a rule is "inconsistent with our Constitution's history and tradition," "the *Terry* doctrine," and "Fourth Amendment doctrine more generally." *Id.* at 655-59.

Pickett argues *Wilson* is dispositive in this case, asserting that "as firearm possession was the only basis for the stop here, Mr. Pickett's motion to suppress should be granted."[42] The Government disagrees. It contends the *Wilson* court's rule—that suspicion of a concealed firearm alone cannot support a *Terry* stop—was unnecessary to the court's holding, which affirmed the *Terry* stop on other grounds, and is therefore non-binding dictum.[43] Further, argues the Government, even if the *Wilson* court's rule regarding *Terry* stops for concealed firearms were binding, this Court should still deny the motion to suppress because the totality of the circumstances—including carrying a concealed weapon "in a potentially toxic environment"—created sufficient reasonable suspicion to support the *Terry* stop in this specific case.[44]

---

[42] ECF No. 62 at 2.
[43] ECF No. 63 at 1-4.
[44] *Id.* at 5-8.

This Court rejects the Government's argument that as a lower court it is free to ignore the Fifth Circuit's guidance in *Wilson* as merely non-binding dictum. "A statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it." *United States v. Segura*, 747 F.3d 323, 328 (5th Cir. 2014) (quoting *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004)). Fifth Circuit panels are "free to disregard" dictum from "prior panel opinions when [they] find it unpersuasive." *Id.* (citation omitted). A statement is not dictum, however, if it is "necessary to the result or constitutes an explication of the governing rules of law." *Id.* (citation omitted).

The *Wilson* court's extensive discussion of its concealed weapon/reasonable suspicion rule indicates the decision was intended to have the force of precedent, rather than be non-binding dictum. *See Wilson*, 143 F.4th at 652-60. The court's extensive analysis of the history and tradition of the Fourth Amendment demonstrates the issue "received the full and careful consideration of the court that uttered it" and "constitute[d] an explication of the governing rules of law." *Segura*, 747 F.3d at 328 (citation omitted). Moreover, even if *Wilson*'s rule were mere dictum, this lower Court would consider such emphatic guidance from the Fifth Circuit to be a highly persuasive, if not a binding, directive. *See also McRorey v. Garland*, 99 F.4th 831, 837 (5th Cir. 2024) (explaining that appellate courts "'are generally bound by Supreme Court dicta, especially when it is recent and detailed'") (citation omitted); *United States v. Rice*, 719 F. Supp. 3d 618, 624 (W.D. Tex. 2024) ("[Dictum from an

appellate court] should be treated with respectful consideration, not only because it proceeds from the appellate court, but also as furnishing a suggestion of the decision which that court might be expected to make if the point should come fairly before it for determination.") (citing HENRY CAMPBELL BLACK, HANDBOOK ON THE LAW OF JUDICIAL PRECEDENTS OR THE SCIENCE OF CASE LAW 166, at 179 (West Publishing Company 1912)).

This Court thus applies the guidance from *Wilson* to the facts of this case. *Wilson* unambiguously stated that "an officer cannot search or seize a person simply because he is keeping or bearing a firearm" and "[t]he mere fact that a citizen carries a firearm does not create reasonable suspicion that he committed a crime." *Wilson*, 143 F.4th at 653, 655. The Court accordingly rejects the Government's argument that the "police were justified in stopping the Defendant based on nothing but reasonable suspicion he was carrying a concealed weapon."[45]

The Government also argues, however, that the officers didn't stop Pickett *solely* because he was suspected of carrying a concealed firearm, but rather that the concealed weapon *plus* the setting—nighttime, on a crowded Bourbon Street, during a weekend that historically sees a crime spike—created sufficient "reasonable suspicion" to conduct a *Terry* stop.

---

[45] ECF No. 32 at 10; *see also id.* at 8 (citing *United States v. Wilson*, No. CR 22-92, 2023 WL 3601590 (E.D. La. May 23, 2023)); *see* ECF No. 42 at 47:6-50:21 (Government asserting that issue is "straightforward" and that officers have reasonable suspicion to detain based on a concealed firearm).

On the one hand, much of the testimony from the suppression hearing suggests that the officers stopped Pickett solely due to his concealed firearm. For example, in the following exchange, Officer Antoine admitted:

> Q. My point is, other than this bulge in his pocket, is there anything that Mr. Pickett is doing that looks like he is about to commit a crime, other than the gun in his pocket?
>
> A. Not other than the weapon.[46]

*See also, e.g.*, ECF No. 42 at 34:3-4 ("[O]ur primary focus was locating firearms on Bourbon Street."); 27:11-12 ("At that point in time, our specific job was to look for illegally concealed weapons."); 23:5-6 ("I observed him in possession of a firearm concealed. That was the danger."); 14:25-16:3 (agreeing that Pickett was "walking calmly," "texting on his phone," was not "nervous" or "out of control" with hands that were not "near his pocket").

Other testimony emphasizes, however, that the context of the crowds on Bourbon Street and the anticipated crime spike over the holiday weekend were also at the forefront of the officers' minds when they stopped Pickett. As the *Wilson* court explained, courts must "consider 'the totality of the circumstances—the whole picture'" when assessing if there is reasonable suspicion to stop a suspect, and officers may "'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Wilson*, 143 F.4th at 659 (citation omitted). "'Relevant facts and considerations may include a description of a suspect, a suspect's location

---

[46] ECF No. 42 at 17:4-8.

and proximity to known or reported criminal activity, the timeliness of information or the stop, a suspect's behavior, and the officer's experience.'" *Id.* (citation omitted).

Officer Antoine testified that she stopped Pickett because he was "[c]oncealing a weapon *on Bourbon Street*,"[47] explaining that her unit was "assigned to Bourbon Street to combat the illegal carrying of firearms and due to a crime spike in that area for the holiday weekend"[48] as the Bayou Classic weekend had previously seen "some shootings, some violent crimes along the Bourbon strip."[49] Officer Tillery similarly testified that he had worked the Bayou Classic weekend in previous years, and "there is an uptick of a crowd during that weekend as well as there being an uptick in crowd, there's usually an uptick in fighting, disturbances, as well as there have been several shootings in the past as well."[50]

Even assuming the officers stopped Pickett not only because of his concealed weapon but also because of the potentially high-crime setting, however, the Government's argument still fails. "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow,* 528 U.S. at 124. Accordingly, the Fifth Circuit has held there still must be something more— the individual must be committing suspicious behavior such as fleeing the premises,

---

[47] *Id.* at 16:16-18 (emphasis added).

[48] *Id.* at 5:19-21.

[49] *Id.* at 5:25-6:5. She further noted that "Bourbon Street is -- is a strip of bars in which you cannot bring a firearm," and that in her experience, past incidents had happened with those who possessed firearms on Bourbon Street that were concealed "whether they were [acting] wild or reckless or calmly walking down the street." *Id.* at 17:18-23.

[50] *Id.* at 32:15-19.

or ignoring an officer's commands, or have been the subject of a plausible tip, for example—to justify a *Terry* stop in a high-crime area. *See, e.g.*, *United States v. Jordan*, 232 F.3d 447, 448 (5th Cir. 2000) (affirming *Terry* stop where the defendant, who was stopped while sprinting away from a grocery store in a high-crime area, was behaving "erratically" and "refused" officers' instructions); *United States v. Bass*, 996 F.3d 729, 734-35(5th Cir. 2021) (affirming *Terry* stop where the officers received a tip about the suspect selling bootleg items from his vehicle in an area known for drug dealing). Conversely, individuals in a high-crime area who do not engage in otherwise suspicious behavior do *not* arouse sufficient suspicion for a *Terry* stop. *See, e.g.*, *Hill*, 752 F.3d at 1031, 1035-36 (holding that the passenger's "quick" exit of a car and "brisk[]" walk to an apartment complex at night in a high-crime area did not justify a *Terry* stop of the car's driver); *United States v. McKinney*, 980 F.3d 485, 488-89 (5th Cir. 2020) (holding that officers lacked reasonable suspicion to stop a group of people merely standing near a gas station that had very recently been the subject of several drive-by shootings).

Here, Officer Antoine expressly confirmed there was nothing specific about Pickett's behavior to arouse suspicion other than the outline of the firearm in his pocket—he was "walking calmly" and "texting on his phone" with hands that were not "near his pocket."[51] In other words, the officers in this case had no information to suggest that Pickett specifically lacked a concealed carry permit or was about to commit any other crime. Rather, their only reasons to stop and temporarily detain

---

[51] *Id.* at 14:25-16:7.

Pickett were (1) the outline of a suspected concealed weapon in his pocket; and (2) his presence in a crowded, high-crime neighborhood at night. But if officers "cannot assume that citizens engaging in an activity subject to licensing are unlicensed," *Wilson*, 143 F.4th at 658, and the only other factor supporting the stop was the defendant's "presence in an area of expected criminal activity," *Wardlow,* 528 U.S. at 124, these two factors together are not enough to generate reasonable suspicion that Pickett was an unlicensed concealed carrier.[52]

Thus, even considering "the whole picture" of the officers' "own experience and specialized training" and the "suspect's location and proximity to known or reported criminal activity," *Wilson*, 143 F.4th at 659 (citations and internal quotations omitted), the officers were not justified in conducting a *Terry* stop on Pickett. Carrying a concealed weapon in a high-crime area, without any independently suspicious behavior from the suspect or an informative tip, is insufficient to create reasonable suspicion for a *Terry* stop.

## C. The Scope of the *Terry* Stop and the Subsequent Arrest Were Unconstitutional

---

[52] The chief cases on which the Government relies are not to the contrary. In each, the suspects exhibited suspicious behavior in the high-crime area. In *United States v. Rideau*, the Fifth Circuit upheld the police officers' *Terry* stop-and-frisk of the defendant because the defendant was not only in a "high crime area" at night, but was also "standing in the road" as the officers drove by; moreover, he "stumbled," appeared drunk, "seemed nervous," and "began to back away" when the officers exited their vehicle and approached him. 969 F.2d 1572, 1573-75 (5th Cir. 1992) ("[T]his detention did not rest solely on Rideau's presence in a bad part of town."). Similarly, in *United States v. Michelletti*, the court upheld a *Terry* stop-and-frisk of a defendant who, at 2:00 a.m. in a "high crime" neighborhood, "barged out the back door of a bar," while "holding an open beer can in his left hand" (a violation of local alcohol laws), with "his right hand in his pants pocket," which contained a concealed firearm. 13 F.3d 838, 839-41 (5th Cir. 1994) (*en banc*) ("Two aspects of Michelletti's behavior led Officer Perry to investigate him[.]").

Even if there was reasonable suspicion to support the initial stop of Pickett, the officers' actions during the stop would require the suppression of the evidence seized from Pickett during his seizure, search, and arrest.

Where an officer has sufficient reasonable suspicion to stop the suspect initially, the suspect's ensuing "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Brigham*, 382 F.3d at 507. Courts examine whether the police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686. The court must ask whether the officer's actions were "reasonably related in scope to the circumstances that justified the stop." *Brigham*, 382 F.3d at 507. A court's analysis of the "[r]easonableness" of the officers' actions during the stop "'eschew[s] bright-line rules, instead emphasizing the fact-specific nature of the . . . inquiry.'" *Id.* (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

At the time of Pickett's arrest, Louisiana law prohibited "[t]he intentional concealment of any firearm . . . on one's person." La. Rev. Stat. § 14:95(A)(1)(a). But that prohibition did "not apply to a person with a valid concealed handgun permit." *Id*. § 14:95(A)(1)(b). The statute further required that any valid permit-holder armed with a concealed handgun must "notify any police officer who approaches the individual in an official manner or with an identified official purpose that the

individual has a weapon on his person, submit to a pat down, and allow the officer to temporarily disarm him." La. Rev. Stat. § 40:1379.3(I)(2).

According to Officer Antoine, the officers' "specific job" that night was to look for "illegally concealed weapons" on Bourbon Street.[53] Officer Antoine testified that she stopped Pickett because he was "[c]oncealing a weapon on Bourbon Street."[54] She confirmed that Pickett was not stopped for any reason "other than the weapon" in his pocket.[55] Officer Antoine further admitted that before she stopped Pickett, she "did not know" whether or not Pickett had a valid concealed carry permit.[56] The "purpose of the stop," therefore, was to determine whether Pickett was illegally carrying a concealed weapon. *Brigham*, 382 F.3d at 507.

The officers' actions here, however, did not ensure that Pickett's detention was "temporary" and lasted "no longer than [] necessary to effectuate the purpose of the stop," which was to confirm whether Pickett had a valid concealed carry permit. *Id.* The body-camera footage shows—and Officers Antoine and Tillery confirmed in their testimony[57]—that the officers did not ask *any* investigatory questions of Pickett during his temporary detention—let alone before he was searched, handcuffed, read his *Miranda* rights, arrested, and escorted to the police station. In other words, the officers did not ask Pickett if he had a concealed carry permit. They did not ask if he was a convicted felon. They did not ask for identification, or whether he had been

---

[53] ECF No. 42 at 27:11-12.
[54] *Id.* at 16:16.
[55] *Id.* at 17:8.
[56] *Id.* at 26:5-14.
[57] *Id.* at 23:23-24:7; 27:11-27:6; ECF No. 27-3 (Ex. A at 00:41-04:32).

drinking, or whether he had used any other substances that evening. What's more, they failed to even *tell* Pickett why he was being detained or arrested until he asked, "what did I do, though?" after the officers had walked him in handcuffs down Bourbon Street.[58]  These were not "reasonable[]" actions by officers who were "diligently pursu[ing] a means of investigation that was likely to confirm or dispel their suspicions quickly" about whether Pickett had a permit. *Sharpe*, 470 U.S. at 686.[59]

At the suppression hearing, the Government argued that the Louisiana concealed carry permit scheme allowed the officers to stop, frisk, and arrest Pickett for illegally carrying a concealed firearm *without* asking or verifying whether he had a permit.[60] The Government pointed to the statute's directive that any valid permit-holder armed with a concealed handgun must "notify any police officer who approaches the individual in an official manner or with an identified official purpose that the individual has a weapon on his person, submit to a pat down, and allow the officer to temporarily disarm him." La. Rev. Stat. § 40:1379.3(I)(2). According to the Government, "[t]he statute puts the burden on the defendant . . . to tell the police at

---

[58] ECF No. 27-3 (Ex. A at 02:48-53).

[59] To be sure, if an individual acts in a threatening or erratic manner during a Terry stop, officers can "take steps for their own safety . . . handcuffing, for example—as long as they are not 'unreasonable in failing to use less intrusive procedures to conduct their investigation.'" *United States v. Scroggins*, 599 F.3d 433, 443 (5th Cir. 2010) (quoting *Jordan*, 232 F.3d at, 448). Similarly, an officer can frisk the individual, so long as there are "specific and articulable facts indicating that [the officers'] safety is in danger." *Rideau*, 969 F.2d at 1576; *see also Scroggins*, 599 F.3d at 441 ("The purpose of the frisk is to afford an officer 'the opportunity to protect himself from attack by a hostile suspect.'") (citation omitted). But as both officers testified at the suppression hearing, Pickett did not exhibit any arguably dangerous traits as he walked calmly by, texting on his phone—other than carrying a suspected concealed weapon in his pocket. ECF No. 42 at 40:24-41:2; 16:12-18. Moreover, even after the officers "grabbed" him, Pickett did not confront the officers or resist in any way; rather, Officer Antoine described Pickett's reaction as "shocked." *Id.* at 16:20. In other words, there were no "specific and articulable facts indicating that [the officers'] safety [was] in danger" to justify immediately grabbing Pickett and forcibly removing the firearm from his pocket. *Rideau*, 969 F.2d at 1576.

[60] ECF No. 42 at 58:1-59:25.

some point" that they have a concealed carry permit and Pickett "could have told [the officers], wait a second, I got a permit."[61] Therefore, argued the Government, when the officers "found a gun fully concealed in [Pickett's] pocket," they had "probable cause to believe that he had committed this crime" of concealed carry without a permit.[62] Indeed, this interpretation of the Louisiana statute was the basis of NOPD's policy:

> THE COURT: Okay. And what was he under arrest for?
>
> THE WITNESS: Illegal carrying of a concealed firearm.
>
> THE COURT: And under NOPD policy, he can be arrested for illegal carrying of a concealed firearm without NOPD having done its own review of whether or not he has a permit to carry a firearm?
>
> THE WITNESS: Yes.[63]

But it is axiomatic that an arrest must be supported by probable cause. *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999). The probable cause standard is *more* demanding than the reasonable suspicion standard. *See Kansas v. Glover*, 589 U.S. 376, 380 (2020) ("the level of suspicion the [reasonable suspicion] standard requires is . . . obviously less than is necessary for probable cause."). "Probable cause exists 'when the facts and circumstances within the arresting officer's personal knowledge, or of which he has reasonably trustworthy information, are sufficient to occasion a person of reasonable prudence to believe an offense has been committed.'" *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988) (citation omitted).

---

[61] *Id.* at 59:23-24.
[62] ECF No. 32 at 7.
[63] ECF No. 42 at 43:12-20.

When the officers placed Pickett under arrest, they knew only that he possessed a concealed firearm. The officers had no additional facts supporting probable cause that Pickett had committed a criminal offense, either because he lacked a concealed carry permit or because he was otherwise prohibited from possessing a firearm. As the *Wilson* court explained, the Louisiana statutory scheme for concealed carry permits could not create a "*per se* presumption of illegality" for gun owners as a class. 143 F.4th at 656-58. In other words, the officers could not assume that Pickett was *illegally* carrying a concealed weapon simply because such an activity requires a permit. *See id.* The court specifically rejected the argument that the procedural requirements of Louisiana's state law—*i.e.*, the requirement that the individual "notify any police officer . . . that the individual has a weapon on his person"—would allow the police to "presume that entire classes of citizens are criminals" to preemptively justify their detention. *Id.* And in any event, the officers here did not even give Pickett the opportunity to inform them whether he had a permit—as evidenced by Pickett's bewildered question, "what did I do, though?" only *after* his arrest and while officers were escorting him from Bourbon Street to the police station.[64]

Accordingly, the scope of the officers' *Terry* stop and the subsequent arrest were not justified. Stopping, searching, arresting, and transporting an individual

---

[64] ECF No. 27-3 (Ex. A at 02:48-53). Moreover, the Louisiana statute required permit-holders to "notify" police officers of their weapon and "submit to a pat down" when an officer "approaches the individual in an *official manner* or with an *identified official purpose*[.]" La. Rev. Stat. § 40:1379.3(I)(2) (emphases added). Here, the officers failed to "approach[]" Pickett in an official manner or with any "identified" purpose—instead, they simply grabbed him, removed his concealed weapon, and handcuffed him.

based on nothing more than the fact that he is undertaking an activity that requires a license—without first confirming whether he has a license—exceeded the officers' lawful authority. *See Wilson*, 143 F.4th at 658 ("Based solely on the observation that someone is driving a car, does an officer have reasonable suspicion that the driver is unlicensed?"). In this case, Pickett was not engaging in any behavior that would arouse reasonable suspicion he was committing a crime—let alone rise to the level of probable cause justifying arrest.

Accordingly,

**IT IS ORDERED** that Pickett's motion to suppress[65] is **GRANTED.**

New Orleans, Louisiana, this 10th day of November, 2025.

BRANDON S. LONG
UNITED STATES DISTRICT JUDGE

---

[65] ECF No. 27.